**[J-50-2017] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| SUSAN A. YOCUM, | : | No. 74 MM 2015 |
| | : | |
| Petitioner | : | |
| | : | |
| | : | ARGUED: April 5, 2016 |
| v. | : | |
| | : | RESUBMITTED: April 26, 2017 |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| PENNSYLVANIA GAMING CONTROL | : | |
| BOARD, | : | |
| | : | |
| Respondent | : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                    **DECIDED: May 25, 2017**

In determining whether the General Assembly has violated the separation of powers by regulating the practice of law in derogation of Article V Section 10(c) of the Pennsylvania Constitution,[1] our inquiry is not confined to the question of whether the

---

[1]     Article V, Section 10(c) provides:

The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts, justices of the peace and all officers serving process or enforcing orders, judgments or decrees of any court or justice of the peace, including the power to provide for assignment and reassignment of classes of actions or classes of appeals among the several courts as the needs of justice shall require, and for admission to the bar and to practice law, and the administration of all courts and supervision of all officers of the Judicial Branch, if such rules are consistent with this Constitution and neither abridge, enlarge nor

(…continued)

challenged legislation applies generally rather than to lawyers alone. Any law that infringes upon this Court's supervisory authority over the legal profession violates our Constitution, regardless of whether the provision happens to regulate non-attorneys as well. I would not hold that what the General Assembly cannot do *solely* to attorneys it *can* nonetheless do to attorneys, provided it does the same thing to some number of non-attorneys as well. Our precedents require no such rule, and the learned Majority's forbearance may have unintended but deleterious effects upon the judiciary and the legal profession that will reveal themselves over time.[2]

In *Shaulis v. Penna. State Ethics Comm'n*, 833 A.2d 123 (Pa. 2003), this Court held that where (and to the extent that) a regulation impairs an attorney's ability to practice her profession after she has left government employment, that regulation must yield to this Court's exclusive authority to regulate the practice of law pursuant to our Constitution. In so ruling, we made two things clear. First, we declared that our

---

(continued…)

> modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose. All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions. Notwithstanding the provisions of this section, the General Assembly may by statute provide for the manner of testimony of child victims or child material witnesses in criminal proceedings, including the use of videotaped depositions or testimony by closed-circuit television.

Pa. Const. art. V, § 10(c).

[2] While I disagree with the Majority's decision to reject Attorney Yocum's challenge to the constitutionality of 4 Pa.C.S. §§ 1201(h)(8) and (13), I join the Majority in its analysis of standing and ripeness.

decision in *Wajert v. State Ethics Comm'n*, 420 A.2d 439 (Pa. 1980), in which we invalidated a one year restriction on a former judge's ability to appear before the court upon which he had served, remained good law. Second, we emphasized that our decisions in *Maunus v. Commonwealth, State Ethics Comm'n*, 544 A.2d 1324 (Pa. 1988), and *P.J.S. v. Penna. State Ethics Comm'n*, 723 A.2d 174 (Pa. 1999), which upheld the constitutionality of ethics requirements applied to government employees *during* their government employment, did not affect *Wajert*'s validity with respect to restrictions directed against government employees *after* their departure from public employment. *See Shaulis*, 833 A.2d at 131-32.

Our *Shaulis* ruling additionally reinforced *Wajert*'s strong suggestion that the reasoning it employed to strike down practice restrictions invoked against a former judge applied equally to invalidate post-government practice restrictions imposed upon attorneys. *See Shaulis*, 833 A.2d at 131 ("[T]he issue in *Wajert*, like the issue in the instant matter, related to the conduct of an attorney who was no longer a public employee. Shaulis and the judge in *Wajert* have simply asserted their right, absent a prohibition from this Court, to practice their profession."). It would be difficult to maintain that any real doubt remains as to whether *Wajert* applies to former public employees who worked as attorneys with the same force that it applies to former judges. To the extent that the issue does remain open, I perceive no material distinction between lawyers and judges that would justify denying former government attorneys the benefit of *Wajert*. I would hold accordingly.

Although *Shaulis* determined that *Wajert* alone was sufficient to compel our ruling in that case, effectively enshrining what we now identify as the current/former

employment distinction, we then proceeded to opine that the provision in question *also* was unconstitutional under a separate test that inquired whether the provision "targeted" those who practice law. *See Shaulis*, 833 A.2d at 132. It is the latter test alone upon which today's Majority relies in finding the statutory provisions at issue here constitutional. Because those provisions apply putatively to a broader class of Gaming Board employees, a class that the Majority evidently assumes consists substantially of non-lawyers, they are deemed not to "target" the practice of law. Consequently, the Majority concludes, they do not offend our Constitution.

By applying this "general applicability" criterion, which strikes me as both dubious in origin and vague in scope and contour, the Majority effectively privileges inferred legislative intent over statutory effect. In future cases, this will require us to divine whether the General Assembly intended to usurp our constitutional authority over the practice of law or merely did so incidentally in service of some other purpose. In the first scenario, the restriction would be invalidated as unconstitutional, but in the second, we seemingly would be bound to find no constitutional violation. In practice, this general applicability criterion affords the General Assembly latitude to take upon itself *de facto* authority to regulate the practice of law provided it does not appear to intend to do so in a targeted fashion, or at least so long as it does so in a manner that also restricts other employees as to whom its authority is not expressly precluded by our Constitution.

The Majority's approach grants the General Assembly too much airspace, allowing it to restrict attorneys in ways that we have previously precluded, so long as its legislation is drafted in language that sweeps up a goodly number of non-attorneys as

well.[3]  I would not dwell on whether what amounts to a clear intrusion upon some number of attorneys' ability to practice their profession in the fashion they choose (to the extent that it is not in violation of this Court's rules) is an *intentional* affront to our authority.  When we are confronted with a violation of separation of powers principles, legislative intent should be immaterial.

Whether ten percent or 100 percent of the employees restricted by a statute are attorneys, the undeniable fact in either scenario is that some attorneys' ability to practice law after they depart government employment has been restricted.  And that ability will have been restricted in a way that this Court never before has permitted, encroaching upon a prerogative that our Constitution reserves to this body, as recognized in *Wajert* and *Shaulis*.  It is unclear to me how we can tolerate a statute that does something undeniably impermissible in its restrictive effect upon attorneys simply because the provision hides impermissible restrictions upon the practice of law behind a passel of similarly restricted non-attorneys.

Consistent with *Shaulis*, I believe that the current/former distinction is sufficient to dispose of the instant matter.  Because I find the generally applicable test, as employed by the Majority, to be problematic, I would forego its application here.  Under *Wajert* and *Shaulis*, it seems clear to me that the General Assembly lacks authority to preclude Attorney Yocum from future employment as a lawyer dealing with the gaming industry.

---

[3]  In point of fact, the Majority leaves open a troubling practical question concerning, *e.g.*, what proportion of a legislated class of public employees must be attorneys before a statutory restriction is no longer generally applicable, what forms of proof may be probative of that proportion, and when and how these proofs will be submitted and considered.

Under our precedents, the statutory provisions here are unconstitutional as applied to former government attorneys.[4]

And yet, our inquiry does not end there. Neither *Wajert* nor *Shaulis* addressed what amount to limitations on attorneys in the form of prohibitions or restrictions upon the solicitation of prospective employment on one's own behalf while still in government service. It is here that the current/former dichotomy becomes difficult in practice. Read literally, while *Wajert* and *Shaulis* preclude legislation that bars Attorney Yocum's employment in the industry after she leaves the Board's employ, those decisions would leave untroubled the Board's prohibition on seeking employment within the gaming industry while still employed by the Board. More than a few lawyers in public service lack the financial cushion that would allow voluntary resignation from one position before another is assured. This aspect of Section 1201(h) is undeniably burdensome.

---

[4]    The Majority opines that I have ignored "the clear holdings of this Court's decisions in *P.J.S.* and *Maunus*[.]" Maj. Op. at 22. Both cases preceded *Shaulis*, and neither provides sufficient clarity in this area of the law as it is implicated in the particular circumstances of today's case. As the Majority notes, *Maunus* did not mention *Wajert* except "in a string-cite list of distinguishable cases[.]" Maj. Op. at 25 n. 9. *Maunus* and *P.J.S.* are distinguishable to the extent that those holdings did not pertain to former employees, while *Wajert* and *Shaulis* are directly relevant to the case at bar. Confronted with a fact pattern distinct from the circumstances at issue in either *Maunus* or *P.J.S.*, the *Shaulis* Court carefully reconciled our precedents in an attempt to clarify this area of the law in relation to former attorney-employees, who were being restrained from practicing their profession. Like the attorney in *Shaulis* and the judge in *Wajert*, the restrictions here purport to cabin Attorney Yocum's ability to practice her profession *in futuro*. Today's case presents an additional wrinkle: here, the Board's restrictions sweep up other employees (non-attorneys) in addition to attorneys. This additional feature does not remove, cure or immunize the impact that the restrictions have upon the practice of law, nor does it alter the fact that these restrictions are inconsistent with our express constitutional authority.

In this connection, I would consider how this Court has exercised its own regulatory authority with regard to the private practice of former government attorneys in capacities that leverage their prior experiences and expertise on behalf of individuals and entities with business before the attorney's former public agency. Our Rules of Professional Conduct impose upon attorneys various affirmative obligations designed to protect against the conflicts of interest that can arise when public employees approach (or are approached by) individuals or entities with interests that lie within their agency's jurisdiction with regard to future employment. To that end, Pennsylvania Rule of Professional Conduct 1.11 prevents a current government official or employee who is an attorney from negotiating employment with individuals and entities who have any present interest in matters with which that attorney is involved in her public capacity. *See* Pa.R.P.C. 1.11(d).[5] However, the commentary to the rule cites the need for

---

[5]    Rule 1.11 ("Special Conflicts of Interest for Former and Current Government Officers and Employees") provides, in relevant part, as follows:

> (d)    Except as law may otherwise expressly permit, a lawyer currently serving as a public officer or employee:
>
>                  * * * *
>
>   (2)         shall not
>
>                  * * * *
>
>     (ii)    negotiate for private employment with any person who is involved as a party or as a lawyer for a party in a matter in which the lawyer is participating personally and substantially, except that a lawyer serving as a law clerk to a judge, other adjudicative officer or arbitrator may negotiate for private employment as permitted by

(…continued)

balance, noting that "the rules governing lawyers presently or formerly employed by a government agency should not be so restrictive as to inhibit transfer of employment to and from the government." Pa.R.P.C. 1.11, note 4.[6]

These provisions make clear that this Court already has considered, and has taken it upon itself to provide for, the scenarios putatively addressed by the provisions of the Gaming Act challenged here, albeit somewhat less broadly than the Act. This implies, and with good reason in light of *Wajert* and *Shaulis*, that this Court long has viewed it as within our own constitutionally-conferred province to dictate how and for

---

(continued…)

> Rule 1.12(b) and subject to the conditions stated in Rule 1.12(b) (requiring such a law clerk first to disclose to his employer his intent to negotiate with such a party or lawyer).

*See also* Pa.R.P.C. 1.11, note 1 ("A lawyer who has served or is currently serving as a public officer or employee is personally subject to the Rules of Professional Conduct, including the prohibition against current conflicts of interest stated in Rule 1.7. In addition, such a lawyer may be subject to statutes and government regulations regarding conflict of interest. . . .").

[6] Having said that, while note 4 to Rule 1.11 is suggestive regarding the impermissibility of proscribing *in toto* what we might characterize as job-seeking by an attorney while still in government employment, it is in undeniable tension with Rule 1.11(d)(2)(ii)'s restriction regarding with whom a government attorney may "negotiate for private employment" while "currently serving as a public officer or employee." While that subparagraph of Rule 1.11 captures direct and obvious conflicts, such as arise when an attorney for a company seeking a gaming license is in talks regarding future employment with a Board attorney who is specifically reviewing that company's application, it leaves the door open to future employment-related discussions with gaming entities or law firms with a gaming practice when it is foreseeable that such entity or firm will appear before the Board under circumstances that may fall within the attorney's bailiwick. This naturally triggers entirely salutary concerns as to an actual or apparent conflict of interest arising from one's present employment, precisely the concerns presumptively embodied in the Gaming Act's prohibitions.

whom attorneys who have left government office or employment may practice. Nothing in the legal authorities, from our Constitution down to our own Rules, suggests that the General Assembly is authorized to intrude upon that authority, whether it applies by its terms exclusively to attorneys or sweeps up a substantially larger class of officials and employees that is not comprised solely or even principally of attorneys.

To the extent that the challenged subsections of Section 1201 purport to bar a *former* Board employee from practicing law in any desired sector with any desired employer after terminating her employment with the Board, they constitute an unconstitutional intrusion upon this Court's exclusive authority to regulate the practice of law.[7] This result is compelled by *Wajert* and *Shaulis.* However, to the extent that the

---

[7]    The Majority appears skeptical of our ability to police our own disciplinary rules concerning conflicts of interest in the legal profession. *See* Maj. Op. at 30 & n. 11. I do not share this skepticism. I believe that the Majority underestimates the efficiency of the disciplinary system and our role in it, while overestimating attorney violations of our Rules of Professional Conduct. While the Majority correctly reports that more than 60,000 lawyers are in active practice in this Commonwealth, it fails to note that the Disciplinary Board, acting under our exclusive authority to regulate attorney conduct, received 3900 complaints in 2016 and resolved 3668 complaints, of which 240 resulted in discipline (most or all of which were the subject of lengthy and detailed review by this Court). *See* Annual Report, The Disciplinary Board of the Supreme Court of Pennsylvania, 2016, *available at* http://www.padisciplinaryboard.org/about/annualreports.php (noting that a disciplinary matter involving a single attorney may consist of multiple complaints).

The Majority contends that the Disciplinary Board lacks sufficient information to monitor conflicts of interest. Maj. Op. at 30 n. 11. True it is that the Board has no obligation to track changes of address in an effort to identify possible conflicts of interest. The practice of law is quintessentially a self-regulating profession. As licensed professionals, attorneys practicing law in this Commonwealth are self-monitoring. They must personally examine their practices to avoid conflicts of interest in representations. Attorneys also have an obligation to report violations of the Rules of Professional Conduct to the Disciplinary Board. Pa.R.P.C. 8.3, Explanatory Comment. Before deciding to change employment or to accept a new representation, attorneys practicing (…continued)

challenged provisions preclude a *current* government attorney from seeking such employment while she is still employed by the Board, they fall within the ambit of *Maunus* and *P.J.S.* and do not exceed the General Assembly's authority to provide generally applicable standards for the conduct of current employees.[8]

Justices Todd and Donohue join this concurring and dissenting opinion.

---

(continued…)
in this Commonwealth have an ethical obligation to consider whether their actions are in compliance with the Rules of Professional Conduct. Of particular significance in the present context, an attorney departing employment with the Gaming Board must determine whether his or her subsequent employment (and representations in connection therewith) complies with Rule 1.11. Law firms in this Commonwealth likewise have a variety of obligations to ensure conflict-free representations. Pa.R.P.C. 1.10.

[8] To be clear, I do not believe that broad statutory restrictions upon current employees, including attorneys who remain in government service, are constitutionally problematic.